No. 18-1173

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

SIERRA CLUB, WEST VIRGINIA RIVERS COALITION, INDIAN CREEK
WATERSHED ASSOCIATION, APPALACHIAN VOICES, and CHESAPEAKE
CLIMATE ACTION NETWORK,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS; and MARK T. ESPER, in
his official capacity as Secretary of the U.S. Army; TODD T. SEMONITE, in his
official capacity as U.S. Army Chief of Engineers and Commanding General of the
U.S. Army Corps of Engineers; PHILIP M. SECRIST, in his official capacity as
District Commander of the U.S. Army Corps of Engineers, Huntington District,
and MICHAEL E. HATTEN, in his official capacity as Chief, Regulatory Branch,
U.S. Army Corps of Engineers, Huntington District
*Respondents*

**PETITIONERS' SECOND MOTION FOR PRELIMINARY RELIEF**

DEREK O. TEANEY
EVAN D. JOHNS
JOSEPH M. LOVETT
APPALACHIAN MOUNTAIN ADVOCATES, INC.
Post Office Box 507
Lewisburg, West Virginia 24901
Telephone:  (304) 793-9007
E-Mail:      dteaney@appalmad.org
*Counsel for Petitioners*

**INTRODUCTION**

Mountain Valley Pipeline, LLC's pipeline is ineligible for the streamlined permit at issue. Respondent United States Army Corps of Engineers (the "Corps") knew that, but nonetheless authorized its use. The Administrative Record reveals that Respondent-Intervenor Mountain Valley Pipeline, LLC ("MVP") admitted its four major river crossings cannot satisfy an express condition of Nationwide Permit ("NWP") 12 in West Virginia limiting the duration of crossing construction. Moreover, the Corps *knew* that to be true when it authorized MVP's use of NWP 12. In an epitomical arbitrary-and-capricious agency action, the Corps determined that MVP's project would comply with all NWP 12's conditions anyway. Because the four major river crossings are ineligible for the streamlined permit, MVP may not lawfully use that permit for any of its stream crossings. 82 Fed. Reg. 1862, 1888 (Jan. 6, 2017). Nonetheless, MVP is currently constructing its entire pipeline under color of the streamlined permit. To prevent those unlawful actions and the resulting irreparable harm, Petitioners (hereinafter, collectively, "Sierra Club") file this Second Motion for Preliminary Relief. The Corps and MVP intend to oppose the motion.[1]

---

1  On May 15, 2018, Sierra Club requested that the Corps stay the authorization pending review, based on evidence produced with the Administrative Record. Ex. 1. When the Corps informed Sierra Club on May 18, 2018, that it intended to invoke the informal consultation provisions of 33 C.F.R. §330.5(d) to determine if it should modify, suspend, or revoke MVP's verification, Sierra

## BACKGROUND

Sierra Club seeks review of the Corps' December 22, 2017 authorization of the discharge of fill material into waters of the United States from the Mountain Valley Pipeline project (the "Pipeline") under NWP 12—a general permit issued under Section 404(e) of the Clean Water Act ("CWA"), 33 U.S.C. §1344(e). MVP plans to construct and operate a 304-mile gas pipeline from Wetzel County, West Virginia, to Pittsylvania County, Virginia. Ex. 3 at AR000003. The Pipeline and its access roads will require 591 waterbody crossings in the Corp's Huntington District, resulting in the discharge of fill material into 7.7 miles of streams and nearly 19 acres of wetlands. *Id.* at AR000003-AR000004. The Pipeline will cross four major rivers (the Elk, Gauley, Greenbrier, and Meadow), three of which (the Elk, Gauley, and Greenbrier) are navigable-in-fact rivers regulated by Section 10 of the Rivers and Harbors Act. *Id.* at AR000007.

The Corps permits dredge-and-fill projects under Section 404 in two ways: through individual permits tailored to specific projects, or through general, nationwide permits ("NWPs") for defined activities that are similar in nature and

---

Club asked the Corps to suspend the verification during that process under 33 C.F.R. §330.5(d)(2)(i). Ex. 2. On May 21, 2018, the Corps informed Sierra Club that it would suspend the verification for only four of the 591 crossings at issue and only pending its completion of informal consultation. *Id.* The Corps declined to suspend the verification for the remaining crossings or for the duration of this litigation. *Id.* The scope of the Corps' forthcoming suspension is both temporally and geographically inadequate. This Court should stay the verification in its entirety pending resolution of this petition.

would cause only "minimal adverse environmental effects." 33 U.S.C. §§1344(a), (e)(1). Many NWPs require would-be-permittees to submit certain projects to the Corps for "verification" using a pre-construction notification ("PCN")." 82 Fed. Reg. at 1985.

The term of an NWP cannot exceed five years. 33 U.S.C. § 1344(e)(2). In January 2017, the Corps reissued its suite of NWPs. *See generally* 82 Fed. Reg. 1860. One of those permits, NWP 12, authorizes discharges related to utility lines, including natural gas pipelines. *Id*. at 1985. For projects, like the Pipeline, that require approval under the Rivers and Harbors Act, NWP 12 requires the submission of a PCN. 82 Fed. Reg. at 1986. "If one or more crossings of waters of the United States for a proposed utility line do not qualify for authorization by NWP, then the utility line would require an individual permit because of 33 C.F.R. §330.6(d)." *Id.* at 1888.

NWP 12's reissuance triggered CWA Section 401, 33 U.S.C. §1341, which provides that federal authorizations resulting in discharges into waterbodies cannot issue without "certification" by the affected state that the discharges will comply with state water quality standards. States can impose special conditions in certifications, which become conditions of the federal permit. *Id.* §1341(d).

The West Virginia Department of Environmental Protection ("WVDEP") certified NWP 12's reissuance under Section 401 on April 13, 2017, subject to conditions to protect water quality. Among them is Condition C:

> Individual stream crossings must be completed in a continuous, progressive manner and **within 72 hours** during seasonal normal or below normal stream flow conditions. Crossings on the Ohio River, Kanawha River, New River, Monongahela River, and the Little Kanawha River, below the confluence with the Hughes River, are exempt from the 72-hour requirements. All stream activities shall be completed as rapidly as possible.

Ex. 3 at AR000045-AR000046 (emphasis added). The Corps incorporated that condition into NWP 12 for West Virginia pursuant to 33 U.S.C. §1341(d) and 33 C.F.R. §330.4(c)(2). Accordingly, NWP 12 in West Virginia includes an express condition limiting in-stream construction to a 72-hour window, except in certain streams not implicated here. Ex. 3 at AR000045-AR000046. The Corps maintains that, aside from the condition requiring individual water quality certification for pipelines like MVP's, "[t]he other special conditions that West Virginia imposed on the use of NWP 12 (in its NWP Certification) continue to apply to the Pipeline[.]" Respondents' Opp'n Br. at 11 n.3 (Doc. # 30).

MVP submitted an NWP 12 PCN for the Pipeline's 591 stream and wetland crossings in the Huntington District. Ex. 3 at AR000003-AR000004. As early as September 2016, the Corps recognized that whether the Pipeline would qualify for NWP 12 or would require an individual permit depended on MVP's crossing plans

— 4 —

for the Elk, Gauley, and Greenbrier Rivers. Ex. 4 at AR021940-AR21942. That is because if even one stream crossing is ineligible for NWP 12, then MVP cannot use that permit for any of the Pipeline's stream crossings. 82 Fed. Reg. at 1888; 33 C.F.R. § 330.6(d). On December 18, 2017, the Corps asked MVP for an "estimate of time required for construction of crossing the Gauley, Elk, Greenbrier, and Meadow River[.]" Ex. 5 at AR001853. MVP responded on December 20, 2017, with the following statement:

> Overall, we are estimating that the entire construction process associated with the crossings of the Elk, Gauley, Greenbrier, and Meadow River crossings will take **a total of 4-6 weeks to complete, 1-3 weeks for each side of the crossings**. This estimation is based on the river size, half-width construction, mobilizing to each river side, staging equipment, pipe welding/bending/placing, installing the portadam[2] and other BMPs, and pre- and post-construction boulder survey/placement technique.

> ... **Actual in stream disturbance associated with installing the portadam will take approximately 2-3 working days. Once the structure is properly installed, the work area is pumped dry, and trench excavation can begin.**

*Id.* at AR001854 (emphasis added). On December 22, 2017, the Corps issued the verification challenged here, acknowledging MVP's prediction that crossings of the Elk, Gauley, Greenbrier, and Meadow Rivers would take 4-6 weeks to

---

2  A "Portadam is an engineered, segmental or linked system that creates a dry workable area[,]" similar to a cofferdam. Ex. 6 at AR002149.

complete, but nonetheless concluding that the Pipeline, "as described, complies with all terms and conditions of [NWP 12]." Ex. 7 at AR000255, AR000268.

## STANDARD OF REVIEW

Four factors govern a stay pending review:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill,* 481 U.S. 770, 776 (1987).

In this proceeding under Section 19(d)(1) of the Natural Gas Act ("NGA"), 15 U.S.C. §717r(d)(1), the Court should apply the Administrative Procedure Act ("APA"). *AES Sparrows Point LNG, LLC v. Wilson*, 589 F.3d 721, 727 (4th Cir. 2009). Under that standard, the Court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). An agency action is "arbitrary and capricious if the agency has ... offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

**I.**   **Sierra Club Is Likely To Succeed On The Merits Because The Corps Arbitrarily and Capriciously Determined That the Pipeline Complies With All NWP 12's Conditions.**

*A. The Pipeline cannot meet NWP 12's conditions.*

The Corps' verification of the Pipeline's eligibility for and compliance with NWP 12 was arbitrary and capricious because:

(1)   a condition of NWP 12 in West Virginia requires all crossings (except for certain rivers not crossed by the Pipeline) to be completed within 72 hours (Ex. 3 at AR000045-AR000046);

(2)   the Corps actively solicited information from MVP about the time required for crossing the Elk, Gauley, Greenbrier, and Meadow Rivers (Ex. 5 at AR001853);

(3)   MVP provided the Corps information unequivocally establishing that it cannot complete those river crossings within 72 hours (*Id.* at AR001854); and

(4)   the Corps, nonetheless, determined the Pipeline "as described, complies with all terms and conditions of [NWP 12]" (Ex. 7 at AR000268).

Because black-letter law holds an agency action that "runs counter to the evidence before the agency" is arbitrary and capricious, Sierra Club is likely to succeed on the merits of its petition. *Motor Vehicle Mfrs. Ass'n*, 463 U.S at 43.

Section D of the 2017 Nationwide Permits provides that,

> [i]n reviewing the PCN for the proposed activity, **the district engineer will determine** whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest. If a project proponent requests authorization by a specific NWP, the district engineer should issue the NWP verification for that activity if it meets the terms and conditions of that NWP, unless he or she determines, after considering mitigation, that the proposed activity will result in more than minimal individual and cumulative adverse effects on the aquatic environment and other aspects of the public interest[.] **For a linear project, this determination *will* include an evaluation of the individual crossings of waters of the United States to determine whether they individually satisfy the terms and conditions of the NWP(s)[.]**

82 Fed. Reg. at 2004-05 (emphasis added). Accordingly, for linear projects like gas pipelines, a district engineer reviewing a PCN, as part of his minimal-adverse-effects determination, must determine whether each stream crossing will satisfy the NWP's conditions.[3] The verb "will" denotes that the district engineer's duty to determine compliance with an NWP's conditions is mandatory. *See Hewitt v. Helms*, 459 U.S. 460, 471 (1983) (characterizing "shall," "will," and "must" as "language of an unmistakable mandatory character").

---

3   The Corps added the linear project obligation to the NWPs in 2012. 77 Fed. Reg. 10,184, 10,287 (February 21, 2012).

Under CWA Section 401(d) and 33 C.F.R. §330.4(c)(2), Condition C of WVDEP's Section 401 Certification of NWP 12 became an NWP 12 condition by operation of law. Condition C's language is unambiguous: "Individual stream crossings ***must*** be completed ... within 72 hours." Ex. 3 at AR000045-AR000046 (emphasis added). Again, "must" is a word of "unmistakable mandatory character." *Hewitt*, 459 U.S. at 471.

An email exchange in the Administrative Record makes clear that MVP cannot comply with NWP 12's 72-hour condition because the crossings of the Elk, Gauley, Greenbrier, and Meadow Rivers will not be completed within 72 hours. Ex. 5 at AR001853-AR001854. The Corps actively solicited an "estimate of time required for construction of crossing the Gauley, Elk, Greenbrier and Meadow River." *Id.* at AR001853. In response, MVP informed the Corps that each crossing "will take a total of 4-6 weeks to complete," with Portadam installation alone taking "2-3 working days" for each side. *Id.* at AR001854. In other words, MVP could use its entire 72-hour window in those rivers just to install the Portadam on one side of the river—with stream-trenching, pipe-laying, and riverbed-reclamation occurring thereafter—before repeating the process on the other side. *Id.*; Ex. 6 at AR002149. Given that it takes 2-3 days just to install the Portadam on one side of the river, it is impossible for MVP to complete crossings of the Elk, Gauley, Greenbrier, and Meadow Rivers in 72 hours.

Notwithstanding that the Corps specifically solicited information about the time required for river-crossing construction, and that the information MVP provided shows that MVP cannot complete those crossings within 72 hours as required by a condition of NWP 12 in West Virginia, the Corps expressly determined that the Pipeline, "as described, complies with *all* terms and conditions of [NWP 12]." Ex. 7 at AR000268 (emphasis added). That determination is the epitome of arbitrary and capricious agency action because it is directly contradicted by the Administrative Record. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. *Lewis v. Berryhill*, 858 F.3d 858, 868 (4th Cir. 2017); *Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.*, 482 F.3d 79, 104 (2d Cir. 2006).

This case is readily distinguishable, legally and factually, from *Snoqualmie Valley Preservation Alliance v. U.S.A.C.O.E.*, 683 F.3d 1155 (9th Cir. 2012), and its progeny. In *Snowqualmie*, the Ninth Circuit "decline[d] to impose a new requirement of a full and thorough analysis of each general condition" in the face of a challenge to the Corps' lack of support for its "conclusory statement that the '[p]roject complies will all terms and conditions'" of the NWPs at issue. *Id.* at 1163-64. But *Snoqualmie* involved the 2007 NWPs and a non-linear project. *Id.* at 1158-59. That is significant because, with the 2012 reissuance of the NWPs, the Corps modified Section D of the NWPs ("District Engineer's Decision") to impose a specific duty on district engineers evaluating *linear* projects to evaluate each

stream crossing to determine whether it individually satisfies the terms and conditions of the NWPs at issue. 77 Fed. Reg. at 10,287. Accordingly, even if *Snoqualmie* were correct about the district engineer's obligations under the 2007 NWPs for non-linear projects, its reasoning does not apply to later-issued NWPs for linear projects like the Pipeline.

Two federal district courts purported to apply *Snoqualmie* to NWP 12 verifications issued under its 2012 iteration, but neither court confronted the language added in 2012 to the "District Engineer's Decision" provision governing linear projects. *Standing Rock Sioux Tribe v. U.S.A.C.O.E.*, 255 F.Supp.3d 101, 145-47 (D.D.C. 2017); *Mobile Baykeeper, Inc. v. U.S.A.C.O.E.*, Civ. No. 14-0032-WS-M, 2014 WL 5307850, *12-*17 (S.D. Ala. Oct. 16, 2014). Accordingly, those district courts did not fully evaluate the district engineer's obligation to consider satisfaction of all NWP 12's conditions. Moreover, those two decisions involved NWP 12 (2012). *Standing Rock Sioux Tribe*, 255 F.Supp.3d at 116; *Mobile Baykeeper*, 2014 WL 5307850, *14. In 2017, however, the Corps added Note 8 to NWP 12, which clarifies that "[t]he district engineer *will* evaluate the PCN in accordance with Section D, 'District Engineer's Decision.'" 82 Fed. Reg. at 1986 (emphasis added). Once more, by using the term "will," the Corps used "language of an unmistakably mandatory character." *Hewitt*, 459 U.S. at 471.

— 11 —

Furthermore, *Snoqualmie* and its progeny are inapposite because, here, the Corps actively solicited information relevant to the 72-hour requirement, MVP provided information, and the Corps made a determination based on that information. In contrast, in *Snoqualmie*, the plaintiffs challenged the Corps' conclusory determination that the project complied with all permit conditions and argued that the determination was unsupported by the record. 683 F.3d at 1163. *Snoqualmie* did not present a case where the record directly contradicted the Corps' determination. *Id.* at 1163-64. Likewise, in *Mobile Baykeeper*, the plaintiffs argued that the Corps' determination of compliance with all permit conditions was arbitrary and capricious because the facts on the ground—though not before the Corps at the time of its decision—showed that the verification authorized discharges that may have been too close to a public water intake to comply with General Condition 7 of the NWPs. 2014 WL 5307850 at *12-*17; *Mobile Baykeeper, Inc. v. U.S.A.C.O.E.*, Civ. No. 14-0032-ES-M, 2014 WL 2569124 at *2 (S.D. Ala. June 9, 2014). Unlike *Mobile Baykeeper*, here the Corps was acutely aware of the facts contradicting its determination that the project satisfies all NWP 12's terms and conditions when it made its decision—indeed, it specifically solicited those facts from MVP. Even if district engineers were not obligated to solicit information regarding compliance with permit conditions or to make specific findings regarding each condition, the APA and basic tenets of

— 12 —

administrative law prohibit district engineers from entirely ignoring contradictory facts in the record.

B. *Sierra Club did not possess the documents necessary to establish its likelihood of success on this claim when it filed its first Motion for Preliminary Relief.*

On May 1, 2018, Sierra Club received the 84,189-page Administrative Record and discovered documents that unequivocally establish that MVP cannot construct crossings of the Elk, Gauley, Greenbrier, and Meadow Rivers within the requisite 72-hour period. Until that time, Sierra Club did not possess the clear evidence necessary to establish a likelihood of success on the merits of the claim presented in this motion.

The Corps' February 28, 2018 filing of the Memorandum for Record with its response to the first Motion for Preliminary Injunction (Doc. #30-3) marked the first time Sierra Club learned the Corps was aware of the general timeframe for completion of MVP's river crossings. But the information in the Memorandum of Record is ambiguous about whether MVP would be conducting activities in jurisdictional waters for more than 72 hours, because the multi-week timeframe described therein includes activities that could occur without discharges of fill material into jurisdictional waters, such as "mobilizing to each river side, staging equipment, pipe welding/bending[], installing ... other BMPs, and pre- and post-construction boulder survey[.]" *Id.* at AR000255. Only on receipt of the

— 13 —

Administrative Record did Sierra Club learn that MVP had made clear to the Corps that it would take at least "2-3 working days" just to install the Portadams on one side of each crossing and that trench excavation and other in-stream work would occur *after* that installation. Ex. 5 at AR001854. Consequently, Sierra Club's Second Motion for Preliminary Relief is appropriate. *See Red Star Yeast & Prod. Co. v. La Budde*, 83 F.2d 394, 396 (7th Cir. 1936) ("Denial of an application for [preliminary relief] does not prevent another application by the same party in the same suit, if new facts warrant it.").

## II.    Sierra Club Will Suffer Irreparable Harm Without Preliminary Relief.

Absent a stay of the Corps' verification, MVP will complete its unlawful crossings of the Elk, Gauley, Greenbrier, and Meadow Rivers before resolution of this petition for review, reducing the effectiveness of any relief Sierra Club might obtain. This petition is scheduled for the September 25-28, 2018 argument session. Doc. # 36. Sierra Club understands that MVP expects to start constructing the four river crossings in late August 2018. An alignment sheet that MVP submitted to Federal Energy Regulatory Commission ("FERC") shows that MVP must complete construction in the Elk River by September 15, 2018, or wait until April 1, 2019. Ex. 8. In its response to the first Motion for Preliminary Relief, MVP stated it intends to place the Pipeline "into service by December 2018." Doc. # 31-

— 14 —

2 at 9. Accordingly, MVP will complete construction in the Elk, Gauley, Greenbrier, and Meadow Rivers before this petition is argued and resolved.

The Corps describes "the Elk, Gauley, Greenbrier, and Meadow river systems [as] important natural resources for the state of West Virginia." Ex. 7 at AR000253. Those rivers "provide a source of drinking water to many communities[,]" "support an abundance of aquatic life[,]" and "provide functions to flora and fauna and values from recreation to aesthetic resources." *Id.* at AR000253-AR000254. The Corps further concedes "the functions and values of [the Elk, Gauley, Greenbrier, and Meadow Rivers] would be impacted by the removal of fish and shellfish habitat, sediment and shoreline impacts, visual quality, and aesthetic impacts." *Id* at AR000254. The Corps' analysis also shows that damming, excavating, and backfilling in all the affected streams—not just the rivers—"would lead to direct and indirect effects including increased sedimentation, increased turbidity, and decreased dissolved oxygen concentrations during in-stream construction" and "would lead to the modification of existing aquatic habitat within the work zone and downstream of the construction area." *Id.* at AR000251.

Bedrock is present at the proposed crossings of the Elk and Greenbrier Rivers. *Id.* at AR000464, AR000491. Expert geologist Pamela Dodds explains that, because bedrock is present at the Greenbrier crossing site, blasting is unavoidable.

— 15 —

Ex. 9 at AR021890. Blasting is similarly unavoidable in the Elk River. Moreover, the Corps believes that the Gauley River crossing may require blasting. Ex. 10 at AR011857. FERC concluded in the Pipeline's Final Environmental Impact Statement ("FEIS") that in-stream blasting could kill and injure aquatic life and that "[c]hemical by-products from blasting materials ... could potentially contaminate the water." Ex. 11 at AR005236.

WVDEP conditioned the use of NWP 12 in West Virginia on completing crossings within 72 hours to assure that water quality standards would not be violated. 40 C.F.R. §§121.2(a)(3)-(4). By impermissibly prolonging in-river construction in the Elk, Gauley, Greenbrier, and Meadow, MVP will impermissibly increase turbidity duration and increase sediment loading in those important rivers. *See* S.M. Reid et al., *Sediment entrainment during pipeline water crossing construction*, 8 J. Envtl. Eng. Sci. 81, 87 (2004) (concluding that "longer periods of instream activity ... increase the risk of sediment being released into the watercourse"), *cited in* FEIS (Ex. 11 at AR005216).

For Sierra Club's members, those impacts hit close to home. Sierra Club member Tammy Capaldo owns and resides on property on the southern end of the Greenbrier River crossing. Ex. 12 at ¶¶1, 3. The Pipeline's construction on her property, including the Greenbrier crossing and its water quality effects, would diminish Ms. Capaldo's aesthetic and recreational enjoyment of her property and

may ultimately lead her to "abandon [her] dream" of living along the river she "hold[s] so dear." *Id.* at ¶¶4, 18, 34. She will permanently forego current uses of her property if the Pipeline is constructed. *Id.* at ¶¶27, 29. Moreover, the extended duration of construction in the Greenbrier will deprive Ms. Capaldo of river access for an unlawful period of time. *Id.*at ¶9, 20.

West Virginia Rivers Coalition Board Member Paul Breuer is a long-time rafting guide who floats and fishes the section of the Gauley River that the Pipeline would cross every year. Ex. 13 at ¶¶2, 4, 6-8. Increased turbidity and sedimentation from the impermissibly-long Gauley crossing will diminish Mr. Breuer's enjoyment of the area and "devastate the aquatic life," including the fishery he enjoys but fears may remain unproductive for years after pipeline construction. *Id.* at ¶¶10-14. Mr. Breuer has witnessed the long-term impacts of a similar pipeline crossing in the same section of the Gauley, including diminished aesthetic values and hazards to navigation and rafters, and expects that similar irreparable effects are likely from the Pipeline's crossing. *Id.* Indeed, based on his decades of experience as a commercial boater, Mr. Breuer has "no doubt that the crossing will negatively impact boating in the immediate area," because of unavoidable stream-topography changes and the introduction of jagged rocks into the riverbed from blasting. *Id.* at ¶¶4, 13.

West Virginia Rivers Coalition member Matthew Kearns is an avid kayaker, who has paddled the Elk River at MVP's proposed crossing, intends to write about that river segment in a "packrafting" guide, and is planning to kayak that section of the Elk this summer. Ex. 14 at ¶¶1-5. Mr. Kearns has serious concerns, based on his education and experience, about the effects of MVP's prolonged stream activities in the Elk, including increased sedimentation and riverbed alterations. *Id.* ¶¶7-8. MVP's planned crossing reduces Mr. Kearns's aesthetic and recreational enjoyment of the Elk River and makes it less likely that he will recommend it to other boaters. *Id.* at ¶10.

Irreparable harm will also soon occur to waterbodies (and their users) besides the four major rivers, from MVP's activities under the color of an NWP for which it is entirely ineligible. As the Corps made clear when it reissued NWP 12 in 2017, "[i]f one or more crossings of waters of the United States for a proposed [pipeline] do not qualify for authorization by NWP then the [pipeline] would require an individual permit because of 33 C.F.R. §330.6(d)." 82 Fed. Reg. at 1888. *See also* 33 C.F.R. §330.6(d) (explaining that all portions of project must seek an individual permit when a dependent portion without independent utility requires an individual permit). The Pipeline requires 497 waterbody crossings in the Corp's Huntington District aside from the major river crossings. MVP's

— 18 —

construction activities in those waters will result in imminent irreparable harm without a stay.

The Pipeline will cross wetlands on the properties of Sierra Club members Ashby Berkley and Jim Gore. Exs. 15 & 16. Mr. Berkley's property includes wetland TTWV-W-MM20, which the Corps identifies as a palustrine forested wetland ("PFO") and for which the Corps has required mitigation to offset the Pipeline's effects. Ex. 3 at AR000036. Mr. Berkley's wetland includes "many gorgeous, mature trees," and, although it has not yet, MVP will soon timber any of those trees within its rights-of-way, causing irreparable harm to those trees and Mr. Berkley. Ex. 15 at ¶19. Mr. Gore's property includes a 0.25-acre forested wetland (TTWV-W-35), which the Corps acknowledges will suffer permanent impacts from Pipeline construction. Ex. 16 at ¶7, 9, 11-12; Ex. 2 at AR000039. Although MVP may have timbered that wetland, it has not yet bulldozed it and preventing further damage will decrease the likelihood of long-term harm to that wetland and Mr. Gore. Ex. 16 at ¶12.

Moreover, the FEIS identifies scores of stream-crossings in areas of shallow bedrock. Ex. 11 at AR006323-AR006437. Hydrologist Dodds predicts that blasting is likely in all areas "less than 10 feet to bedrock," Ex. 9 at AR021905-AR21906, which would include those stream crossings in shallow bedrock. Such blasting will cause irreparable harm to the streams. Ex. 11 at AR005236.

One Monroe County stream located in shallow bedrock is TTWV-S-108, or the Narrows of Hans Creek. Ex. 11 at AR006396. Sierra Club member Maury Johnson has visited the Narrows of Hans Creek multiple times a year throughout his lifetime. Ex. 17 at ¶21. But Mr. Johnson will be forced to abandon permanently his aesthetic and recreational use of that "very special place and its unique ecosystem" because, among other reasons, "the pipeline right-of-way would create an intolerable eyesore." *Id.* Moreover, Indian Creek—where Mr. Johnson was baptized—also lies in shallow bedrock. Ex. 11 at AR006394. Stream disturbance at that crossing will cause irreparable damage to that stream, its aesthetics, and Mr. Johnson's enjoyment of it. Ex. 17 at ¶20. The Pipeline will also cross streams on Mr. Johnson's organic farm. *Id.* at ¶¶7-8. Those tributaries of Hans Creek (designated as S-Z4 and S-Z5) are also in shallow bedrock. Ex. 11 at AR006395. His domestic well has a hydrologic connection to those streams, and Pipeline construction will contaminate his well water. Ex. 17 at ¶10. Pipeline construction will likely cause Mr. Johnson to leave and/or sell his property. *Id.* at ¶17.

The Supreme Court holds that environmental harms like those described above, "by [their] very nature, can seldom be adequately remedied by money damages and [are] often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 545 (1987). The "dredging and filling of [waterbodies] that may occur while [a c]ourt decides [a] case cannot

— 20 —

be undone." *Sierra Club v. U.S.A.C.O.E.*, 399 F.Supp.2d 1335, 1348 (M.D. Fla. 2005). There simply "is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into waters ... or in wetlands." *U.S. v. Malibu Beach, Inc.*, 711 F.Supp. 1301, 1313 (D.N.J. 1989). The loss of mature forests is not compensable by money, rendering that type of loss quintessentially irreparable. *See, e.g.*, *W. Land Exch. Project v. Dombeck*, 47 F.Supp.2d 1216, 1218 (D.Or. 1999). Finally, the Pipeline construction's lethal effect on aquatic life "is, by definition, irreparable." *Humane Soc'y v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008).

## III.   Preliminary Relief Will Not Substantially Harm the Corps or MVP.

In contrast to the real and permanent environmental harms discussed above, equitable relief would pose only minimal or temporary injury to the Corps and MVP. Although the Corps has interests in defending its permits and permitting process, "the effect of an injunction on these interests seems rather inconsequential." *O.V.E.C. v. U.S.A.C.O.E.* (*O.V.E.C. II*), 528 F.Supp.2d 625, 632 (S.D.W.Va. 2007).

As for MVP, any "[l]oss of anticipated revenues generally does not constitute harm to others affected by injunctions in environmental cases." *Anglers of the AU Sable v. U.S.F.S.*, 402 F.Supp.2d 826, 839 (E.D. Mich. 2005) (citing *N.P.C.A. v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001)). Monetary loss is relevant

to the balance of harms only when it "threatens the very existence of the movant's business." *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985). *Accord Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981). This is not such a case, as MVP has never maintained that it will go out of business if it has to seek an individual Section 404 permit instead of using NWP 12.

Moreover, MVP cannot now object that the application of the stream-crossing duration condition would cause it substantial harm because it forewent opportunities to seek administrative or judicial review of WVDEP's imposition of that condition on NWP 12 under West Virginia law, notwithstanding that its PCN was pending when WVDEP imposed the condition. That is, MVP has waived any objection to the condition at issue, and "a party may not claim equity in his own defaults." *Long v. Robinson*, 432 F.2d 977, 981 (4th Cir. 1970).

## IV.    The Public Interest Favors Preliminary Relief.

Where environmental resources are threatened, "the balance of harms will usually favor the issuance of an injunction." *Amoco Prod. Co.*, 480 U.S. at 545. *See also N.W.F. v. Burford*, 676 F.Supp. 271, 279 (D.D.C. 1985). Moreover, the "public has an interest in the integrity of the waters of the United States and in seeing that administrative agencies act within their statutory authorizations and abide by their own regulations." *O.V.E.C. v. Bulen*, 315 F.Supp.2d 821, 831 (S.D.W.Va. 2004). The CWA embodies the "balance Congress sought to establish

— 22 —

between economic gain and environmental protection." *O.V.E.C. v. U.S.A.C.O.E.*, 528 F.Supp.2d 625, 633 (S.D.W.Va. 2007). Ensuring Congressional mandates are carried out is always in the public interest. *See*, *e.g.*, *Johnson v. U.S.D.A.*, 734 F.2d 774, 788 (11th Cir. 1984).

## CONCLUSION

For the foregoing reasons, Sierra Club requests that this Court stay the Corp's verification of NWP 12 for the Pipeline pending resolution of the petition for review.

Dated:  May 22, 2018                    Respectfully submitted,

                                        /s/ **Derek O. Teaney**
                                        DEREK O. TEANEY
                                        EVAN D. JOHNS
                                        JOSEPH M. LOVETT
                                        APPALACHIAN MOUNTAIN ADVOCATES, INC.
                                        Post Office Box 507
                                        Lewisburg, West Virginia 24901
                                        Telephone:    (304) 793-9007
                                        Facsimile:    (304) 645-9008
                                        E-Mail:       *dteaney@appalmad.org*
                                        *Counsel for Petitioners*

— 23 —

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT**

This motion complies with the type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 5,196 words. This brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011 in Times New Roman, 14 point.

/s/ **Derek O. Teaney**
DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone:  (304) 793-9007
Email:        dteaney@appalmad.org

## CERTIFICATE OF SERVICE

I hereby certify that, on May 22, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ **Derek O. Teaney**

DEREK O. TEANEY

APPALACHIAN MOUNTAIN ADVOCATES, INC.

P.O. Box 507

Lewisburg, WV 24901

Telephone:   (304) 793-9007

Email:        dteaney@appalmad.org